Jason M. Rudd, Tex. Bar No. 24028786
Scott D. Lawrence, Tex. Bar No. 24087896
WICK PHILLIPS GOULD & MARTIN, LLP
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Email: jason.rudd@wickphillips.com
scott.lawrence@wickphillips.com

***COUNSEL TO KRISTEN KRZYZEWSKI, TREMBLANT CONSULTANTS, LLC, TRUE LTC LLC, TRUE LTC LEAD ACO, LLC, TRUE LTC HOLDINGS GROUP, LLC, TRUE LTC ADMINISTRATIVE SERVICES, LLC, CAROL BAUER, RYAN ROMANO, JILL FORD, AND MAUREEN WARD***

Emily Wilbur (admitted *pro hac vice*)
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone: (312) 212-4949
Email: ewilbur@beneschlaw.com

Noelle Torrice (admitted *pro hac vice*)
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
1313 N. Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7010
Email: ntorrice@beneschlaw.com

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>GENESIS HEALTHCARE, INC., et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 25-80185 (SGJ)<br><br>(Jointly Administered) |
| LTC ACO LLC, GENESIS HEALTHCARE LLC, and GENESIS HEALTHCARE, INC.,<br><br>Plaintiffs,<br>v.<br><br>KRISTEN KRZYZEWSKI, an individual; TREMBLANT CONSULTANTS, LLC, a Maryland limited liability company; TRUE LTC LLC, a Wyoming limited liability company; TRUE LTC LEAD ACO, LLC, a Wyoming limited liability company; TRUE LTC HOLDINGS GROUP, LLC (f/k/a LEAD LTC Holdings Group, LLC), a Wyoming limited liability company; TRUE LTC ADMINISTRATIVE SERVICES, LLC, a Wyoming limited liability company; CAROL BAUER, an individual; RYAN ROMANO, an individual; JILL FORD, an individual; MAUREEN WARD, an individual.<br><br>Defendants. | Adv. Proc. No. 26-08012-sgj |

# DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ... 1

II. STATEMENT OF FACTS ... 1

A. The Defendants Did Not Steal Or Use Plaintiffs' Confidential Information ... 1

B. True Competes Using Commercially Available Data and Information ... 4

C. Exclusivity / TIN splitting ... 6

III. ARGUMENT ... 8

A. Plaintiffs Do Not Meet The Standard For A Preliminary Injunction ... 8

B. Plaintiffs Are Unlikely to Succeed on the Merits ... 8

i. The Automatic Stay Claims Fail (Counts I and II) ... 8

ii. The Trade Secret Misappropriation Claim Fails (Count III) ... 9

iii. The Breach of Contract Claims Fail (Counts V-VIII) ... 12

a. Breach of Contract as to Krzyzewski and Tremblant ... 12

b. Breach of Contract as to Ford ... 13

c. Breach of Contract as to Ward ... 14

iv. The Tortious Interference Claims Fail (Counts X and XI) ... 15

C. Plaintiffs Have Not Demonstrated Irreparable Harm ... 16

i. Plaintiffs Delay in Bringing This Motion Makes Clear There is No Justification In Granting The Motion ... 16

ii. Plaintiff Provides The Court With No Competent Evidence To Establish Irreparable Harm ... 17

D. The Balance of Hardships Favors Defendants ... 21

E. The Public Interest Weighs Against The Requested Relief ... 22

F. The Requested Relief is Overbroad ... 24

G. If A Preliminary Injunction Is Entered, an Injunctive Bond Should be Ordered ........ 25

IV. CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acme Refrigeration Supplies, Inc. v. Acme Refrigeration of Baton Rouge*,
961 F. Supp. 936 (E.D. La. 1996) .......... 21

*ADT, LLC v. Capital Connect, Inc.*,
145 F. Supp. 3d 671 (N.D. Tex. 2015) .......... 18

*Am. Biocarbon, LLC v. Keating*,
2020 WL 7264459 (M.D. La. Dec. 10, 2020) .......... 10

*Apple Barrel Prods., Inc. v. Beard*,
730 F.2d 384 (5th Cir. 1984) .......... 21

*BeatStars, Inc. v. Space Ape Ltd.*,
624 F. Supp. 3d 681 (W.D. Tex. 2022) .......... 16

*BioTE Med., LLC v. Jacobsen*,
406 F. Supp. 3d 575 (E.D. Tex. 2019) .......... 17

*C.E. Servs., Inc. v. Control Data Corp.*,
759 F.2d 1241 (5th Cir. 1985) .......... 15

*CAE Integrated, L.L.C. v. Moov Techs., Inc.*,
44 F.4th 257 (5th Cir. 2022) .......... 11, 12

*Canal Auth. of State of Fla. v. Callaway*,
489 F.2d 567 (5th Cir. 1974) .......... 8

*Cardoni v. Prosperity Bank*,
805 F.3d 573 (5th Cir. 2015) .......... 11

*Centennial Bank v. Holmes*,
717 F. Supp. 3d 542 (N.D. Tex. 2024) .......... 9

*Continuum Co. v. Incepts, Inc.*,
873 F.2d 801 (5th Cir. 1989) .......... 25

*Cooper Valves, LLC v. ValvTechnologies, Inc.*,
531 S.W.3d 254 (Tex. App.—Houston [14th Dist.] 2017, no pet.) .......... 25

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
661 F.2d 328 (5th Cir. Unit B 1981) .......... 18

*Dennis Melancon, Inc. v. City of New Orleans*,
703 F.3d 262 (5th Cir. 2012) ....................18

*DeWolff, Boberg & Assocs. Inc. v. Pethick*,
133 F.4th 448 (5th Cir. 2025) ....................10

*Dickey's Barbecue Restaurants, Inc. v. GEM Inv. Grp., L.L.C.*,
No. 3:11-CV-2804-L, 2012 WL 1344352 (N.D. Tex. Apr. 18, 2012) ....................21

*Embarcadero Techs., Inc. v. Redgate Software, Inc.*,
No. 1:17-cv-444-RP, 2017 WL 5588190 (W.D. Tex. Nov. 20, 2017) ....................16

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
762 F.2d 464 (5th Cir. 1985) ....................18

*Gonannies, Inc. v. Goupair.Com, Inc.*,
464 F. Supp. 2d 603 (N.D. Tex. 2006) ....................16

*Holland Am. Ins. Co. v. Succession of Roy*,
777 F.2d 992 (5th Cir. 1985) ....................20

*HTI Health Servs., Inc. v. Quorum Health Grp., Inc.*,
960 F. Supp. 1104 (S.D. Miss. 1997)....................23

*Jackson Women's Health Org. v. Currier*,
760 F.3d 448 (5th Cir. 2014) ....................8

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011) ....................17

*In re Mem'l Hermann Hosp. Sys.*,
464 S.W.3d 686 (Tex. 2015)....................22

*Montes v. Benelux Corp.*,
794 F. Supp. 3d 420 (W.D. Tex. 2025)....................12

*Monumental Task Comm., Inc. v. Chao*,
678 F. App'x 250 (5th Cir. 2017)....................20

*Monumental Task Comm., Inc. v. Foxx*,
157 F. Supp. 3d 573 (E.D. La. 2016)....................20

*Nicholas v. Alcatel USA, Inc.*,
532 F.3d 364 (5th Cir. 2008) ....................25

*NMTC Corp. v. Conarroe*,
99 S.W.3d 865 (Tex. App.—Beaumont 2003, no pet.) ....................22

*In re OGA Charters, LLC*,
554 B.R. 415 (Bankr. S.D. Tex. 2016) ....................................................................21

*Providence Title Co. v. Truly Title, Inc.*,
547 F. Supp. 3d 585 (E.D. Tex. 2021)....................................................................9

*Reliant Hosp. Partners, LLC v. Cornerstone Healthcare Grp. Holdings, Inc.*,
374 S.W.3d 488 (Tex. App.—Dallas 2012, no pet.)................................................25

*State v. Biden*,
10 F.4th 538 (5th Cir. 2021) ....................................................................................20

*TMRJ Holdings, Inc. v. Inhance Technologies, LLC*,
540 S.W.3d 202 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ...........................24

*Topstone Commc'ns, Inc. v. Xu*,
729 F. Supp. 3d 701 (S.D. Tex. 2024) .....................................................................10

*Ultraflo Corp. v. Pelican Tank Parts, Inc.*,
926 F. Supp. 2d 935 (S.D. Tex. 2013) .......................................................................9

*Universal Health Servs., Inc. v. Thompson*,
24 S.W.3d 570 (Tex. App.—Austin 2000, no pet.) ..................................................23

*Visto Corp. v. Sproquit Technologies, Inc.*,
413 F. Supp. 2d 1073 (N.D. Cal. 2006) ...................................................................22

*Wal–Mart Stores, Inc. v. Sturges*,
52 S.W.3d 711 (Tex. 2001)......................................................................................16

*Watchguard Techs., Inc. v. Valentine*,
433 F. Supp. 2d 792 (N.D. Tex. 2006) ....................................................................18

*Wyly v. Pres. Dallas*,
165 S.W.3d 460 (Tex. App.—Dallas 2005, no pet.)..................................................8

**Statutes**

11 U.S.C. § 362(a)(3)..................................................................................................8

42 U.S.C. § 1395x(v)(1)(I) .....................................................................................3, 13

Defend Trade Secrets Act, 18 U.S.C. § 1836 ..............................................................9

Defend Trade Secrets Act, 18 U.S.C. § 1839 ..............................................................9

Tex. Civ. Prac. & Rem. Code Ann. § 134A.002..........................................................9

Texas Uniform Trade Secrets Act..................................................................................9

**Other Authorities**

42 C.F.R. § 425.306(b)(2) .....15

42 CFR 425.402 .....6

Federal Rule of Civil Procedure 65(c) .....25

# I. INTRODUCTION

Plaintiffs LTC ACO, LLC ("LTC ACO"), Genesis Healthcare LLC, and Genesis Healthcare, Inc. (collectively, "Genesis", and, together with LTC ACO, "Plaintiffs") brought this suit in a transparent effort to tank a lawful competitor. Plaintiffs' Motion is a thinly veiled attempt to both weaponize the bankruptcy process and the automatic stay to stifle legitimate competition by former executives who left voluntarily and lawfully. Notwithstanding Plaintiffs' arguments to the contrary, Defendants took no confidential information and certainly did not use any of Plaintiffs' confidential information in pursuing the formation and operation of True LTC LLC ("True"). The MSSP market is designed to be competitive, with CMS itself providing publicly available databases of information helpful to get an ACO off the ground, and there are paid platforms designed to make that process even easier. Competition ensures both choice and better outcomes for Medicare patients. Yet, Plaintiffs seek to create non-competes for their former employees and agents by warping the facts and spouting baseless allegations against them. An injunction against Defendants at this juncture would certainly doom True – harming the physicians and physician groups prepared to practice under True for the 2027 calendar year, and therefore, their patients would be harmed as well. Such a drastic result cannot be warranted in a circumstance where the evidence will ultimately disprove Plaintiffs' allegations.

# II. STATEMENT OF FACTS

## A. The Defendants Did Not Steal Or Use Plaintiffs' Confidential Information

LTC ACO was co-founded by Defendant Kristen Krzyzewski, who was a consultant to the company and not bound by a non-solicitation covenant. Ultimately, LTC ACO was successful in the market under Krzyzewski, but circumstances rapidly changed as Genesis fell under mismanagement. In July 2025, Plaintiffs and other Genesis subsidiaries and/or affiliates declared Chapter 11 bankruptcy. Following the filing, the Debtors retained restructuring professionals, the

ACO CEO resigned in November of 2025, and Genesis sought to identify an Acting President for the ACO during bankruptcy. Brittain Brantley, who was hired as the ACO Chief Operating Officer in August of 2025, was interviewed for the LTC ACO Acting President role. Genesis instead named Krzyzewski as Acting President in late November 2025.

Almost immediately following his hiring as COO, Brantley's management style created significant internal friction. In late November 2025 and again in late January and early February 2026, Krzyzewski escalated her concerns to Genesis that LTC ACO key employee retention was at risk because of internal mismanagement, yet those concerns fell on deaf ears.

Ultimately Genesis decided to transition Brantley to the Acting President role and Krzyzewski submitted her resignation. Krzyzewski informed contacts of her departure, while assuring them that they remained in good hands with the LTC ACO team. Subsequently, the Individual Defendants left Plaintiffs' employ several months after Krzyzewski's departure because of the same hostile working environment detailed by Krzyzewski. Genesis' HR had advance notice that these employees were unhappy with management and at risk of leaving. There was no coordinated plan or scheme to steal trade secrets. Critically, Krzyzewski was not subject to any non-compete or non-solicit under the Tremblant Consultants Consulting Agreement with Genesis (the "Consulting Agreement"). Ex. F to Compl.

Further, Plaintiffs' allegations that Krzyzewski downloaded internal documents out of the LTC ACO ecosystem is categorically false. As a consultant, she was responsible for maintaining her own files on her own computer, which she used with Plaintiffs' knowledge and assent during her tenure at LTC ACO. On February 11, 2026, at the direction of Genesis IT, she downloaded from her personal laptop and OneDrive cloud to the "Transitioned Executive" folder on the Genesis/LTC ACO Google drive all of her LTC ACO files. Krzyzewski did this for one reason: in

order to ensure a smooth transition as she departed from LTC ACO. Moreover, Krzyzewski confirmed this activity in a February 28, 2026 email to Rochelle Moore at Genesis legal. *See* **Exhibit A**.

Plaintiffs' allegations regarding the downloading activity of the Individual Defendants are similarly misplaced. The Individual Defendants downloaded materials to their work computers and within LTC ACO's closed-loop system as part of their normal work responsibilities. Defendants utilized a Google drive to perform their job duties. In order for an employee or agent to work on these documents, they would need to be downloaded to be used within the Microsoft Office suite of products. Additionally, prior to Bauer's and Ward's departures from LTC ACO, Bauer and Ward removed personal files that had been saved to their respective work computers. This activity was conducted at the direction of Genesis's Compliance Officer, Teresa Moslbee.

Plaintiffs make much of the fact that Krzyzewski retained documents that were stored on her computer. Far from evidence of misappropriation of trade secrets, this retention shows Krzyzewski's commitment to meeting her contractual and legal obligations. Pursuant to paragraph 11 of the Consulting Agreement (and 42 U.S.C. § 1395x(v)(1)(I)), Krzyzewski was required to maintain her consulting records for 4 years following termination. The provision explicitly states:

[redacted]

Ex. F to Compl.

When Plaintiffs demanded Krzyzewski destroy her records, she pointed to this obligation. Plaintiffs offered her a limited waiver, but the waiver would not alleviate the legal obligations

referenced in the provision. In order to ensure legal compliance, she did not destroy her records but confirmed she would satisfy the confidentiality requirements in her contract, which she has done. Indeed, Krzyzewski offloaded her documents into a USB drive and kept the drive in a physical safe.[1]

B. True Competes Using Commercially Available Data and Information

While Krzyzewski remained open to the possibility of rejoining LTC ACO, those discussions ultimately fell through. Therefore, True was incorporated in early March 2026 and has operated transparently. Krzyzewski openly identified herself as "Founder & CEO, True LTC, The Long-Term Care ACO Experts" in all correspondence from her True email address. True was funded by Krzyzewski's personal capital.

Crucially, True did not rely on LTC ACO's proprietary models or data to conduct business. Instead, True expended more than six figures to purchase commercially-available data from Milliman, a well-known actuarial and consulting firm. Milliman provides consulting, data analytics, and software tools to help provider groups, ACOs, and health systems manage risk, analyze claims, identify Medicare-billing groups in relevant places of services (such as long-term care and assisted living facilities), estimated MSSP assignment and costs for Medicare-billing groups, and optimize value-based care performance. Milliman has multiple features that are valuable to an ACO, all of which have been extraordinarily valuable to True in its launch.

Milliman's ACO Builder MSSP tools consolidate provider data into one comprehensive, up-to-date dataset representing all US-based providers and group practices, including billing and servicing NPI, place of service, provider/clinician, group practice, clinic/location, and affiliation

[1] Krzyzewski identified four additional True documents that remained on her computer on August 29, 2026. She only became aware of these documents because of her review of her personal computer to ensure compliance with the Stipulation and Agreed Order to Maintain the Status Quo. She did not use those documents as she was unaware they existed. She immediately sent the documents to counsel and has since deleted them from her computer.

metrics. Milliman tools can also provide future projections into the performance year to forecast shared savings or loss – projections which allow an ACO to determine if it will be in line with CMS's projections.[2] Milliman describes this product as "a pro-forma projection model with Milliman's unparalleled ACO expertise and the complete Medicare experience data is built in."[3] It defies credulity that Krzyzewski and True would spend in excess of $100k to purchase data True purportedly stole from LTC ACO – a proposition that Defendants categorically deny.

Milliman is only one tool available to ACOs – other options include falconhealth.ai, which is much cheaper than Milliman but is unable to conduct a full benchmark estimation, resulting in True's decision to expend the costs necessary to access same. Simply put, and contrary to Plaintiffs' inflammatory claims, Defendants have approached the development and operations of True with the Individual Defendants' contractual obligations to LTC ACO at the forefront.

Even outside of these paid services, much of the information critical to an ACO's success is publicly available through CMS. Thus, True used CMS regulatory information when discussing financial parameters with potential provider groups. After each performance year, CMS publishes the Shared Savings Program Performance Year Financial and Quality Results (the "Shared Savings Results"), and makes them publicly-available online.[4] As stated by CMS, the Shared Savings Results "provides Medicare Shared Savings Program (Shared Savings Program) ACO-specific quality, expenditure, benchmark, and shared savings/loss metrics, as well as summarizes beneficiary and provider information for each performance year of the Shared Savings Program."

True's discussions with prospective provider groups consistently referenced publicly-available CMS program details – benchmark methodology changes, the LEAD program's 1.5%

---

[2] https://us.milliman.com/en/products/milliman-aco-builder
[3] *Id*.
[4] https://data.cms.gov/medicare-shared-savings-program/performance-year-financial-and-quality-results

add-on for eligible participants, risk adjustment model recalibrations – rather than proprietary LTC ACO data. During negotiations, the targeted benchmark True offered was developed based on public data and the Defendants' decade-long experience in the industry. Critically, True's benchmark [redacted], which further demonstrates True's independent development in determining same.

Publicly available information and data platforms proved the most fruitful for True to utilize to enter the ACO market. In addition to these independent efforts by True, some provider groups also reached out to True directly in the first instance. This is not surprising as the Individual Defendants are experts in their field, and, given the upheaval at Genesis, provider groups likely sought trusted expertise from Krzyzewski and True.

C. <u>Exclusivity / TIN splitting</u>

Under CMS regulations, the exclusivity requirement applies at the TIN level, not the provider group level. CMS makes this clear: "[a]ny ACO participant, as identified by the taxpayer identification number (TIN), that has a specialty used in assignment (reference 42 CFR 425.402), and bills Medicare for primary care services must be exclusive to a single Shared Savings Program ACO. However, individual practitioners, identified by individual National Provider Identifiers (NPIs), are free to participate in multiple ACOs if they bill under several different TINs."[5] The second sentence within CMS's guidance explicitly allows for what is colloquially known as "TIN splitting." TIN splitting occurs when a provider group splits its providers into different TINs. Upon information and belief, many of the provider groups that have agreed to participate with True have additional TINs and are or may be participating in other ACOs. Again, this is not surprising in the ACO market where providers routinely participate in multiple

---

[5] Program Guidance & Specifications, CMS, https://www.cms.gov/medicare/payment/fee-for-service-providers/shared-savings-program-ssp-acos/guidance-regulations (last accessed Aug. 27, 2026).

programs simultaneously through TIN splitting. This allows a provider group to diversify its portfolio – that is, having specific providers under different ACOs, while each TIN remains exclusive to its ACO.

During the course of negotiations with prospective provider groups, True ensured that the groups were aware of the specific CMS requirements surrounding exclusivity and TIN splitting. True also informed prospective provider groups on the impact of overlap in its contracts when requested by provider groups.

In fact, True and LTC ACO only have *two* overlapping TINs.[6] One TIN belongs to [redacted] – which has just [redacted] in performance year 2025 according to the Milliman data purchased by True. This miniscule amount of overlap shows that True did not, and cannot have, built out its provider list through improper means. Plaintiffs had the ability to determine this information independently, as this information is available on the CMS Website Application Portal directly, noting each overlap that must be resolved prior to the TIN withdrawal deadline. While Plaintiffs manufactured an emergency on the basis of potentially-overlapping TINs, these assertions have already been disproven through True's voluntary exchange of information. The lack of meaningful overlap of the Plaintiffs' and Defendants' exchanged TINs lists and the factually inaccurate allegations related to LTC ACO's confidential information means Plaintiffs' Motion must be denied.

[6] True's own analysis identified [redacted] as an overlapping TIN. Upon information and belief, there is one other TIN overlap between True and LTC ACO. True only learned of this overlap in the course of an exchange of TIN lists pursuant to the Status Quo Order entered at D.I. 9.

## III. ARGUMENT

### A. Plaintiffs Do Not Meet The Standard For A Preliminary Injunction

Absent extraordinary circumstances, a Court may not grant a preliminary injunction that disturbs the status quo and gives the litigant the ultimate relief it seeks at the outset of litigation. Injunctive relief is an extraordinary remedy that should not be granted unless the movant clearly establishes the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury to the movant outweighs any damage the injunction might cause to the opponent (the balance of hardships); and (4) that the injunction will not disserve the public interest. *Jackson Women's Health Org. v. Currier*, 760 F.3d 448 (5th Cir. 2014).

The burden lies entirely with the moving party to prove that an injunction should be granted, and courts should not issue injunctive relief based on speculation or conclusory allegations. *See Wyly v. Pres. Dallas*, 165 S.W.3d 460, 465 (Tex. App.—Dallas 2005, no pet.). Plaintiffs cannot contract away their burden to present evidence of each of these elements. This is especially true where, as here, the injunctive relief that plaintiff seeks is not one preserving the status quo, it is changing the existing competitive dynamics. *See Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

### B. Plaintiffs Are Unlikely to Succeed on the Merits

#### *i. The Automatic Stay Claims Fail (Counts I and II)*

Counts I and II are dead on arrival – in order to show a likelihood of success on the merits, Plaintiffs must show that Defendants attempted to take or took "property belonging to the estate." 11 U.S.C. § 362(a)(3). Contrary to Plaintiffs' claims, Defendants did not steal Plaintiffs' confidential information. Rather, the purported download activity represents work done in the general course of business for LTC ACO, uploading by Krzyzewski of her files to the LTC ACO

database, and/or removing of personal documentation prior to departure with the approval of Genesis' Compliance Officer. Moreover, the vast majority of the categories of confidential information allegedly downloaded is available on CMS or paid databases such as Milliman.

With publicly and commercially available information, combined with the Individual Defendants' knowledge, skills and general industry expertise (which are not property of the estate), Defendants were able to build True and create their own financial goals and projections without the need for or benefit of *any* of Plaintiffs' property. True, as with other ACOs, maintains non-exclusive contracts with its provider groups. That is, provider groups are free to participate in other ACOs and CMS programs through programmatic design and through TIN splitting.

*ii. The Trade Secret Misappropriation Claim Fails (Count III)*

Under the Defend Trade Secrets Act (DTSA), 18 U.S.C. §§ 1836 and 1839 *et seq*. and Texas Uniform Trade Secrets Act, Plaintiffs must show (1) ownership of a trade secret that (2) has been misappropriated and that (3) relates to a product or service in interstate commerce. *Providence Title Co. v. Truly Title, Inc.*, 547 F. Supp. 3d 585 (E.D. Tex. 2021). A trade secret is one where the owner must take reasonable measures to keep it secret, and it must derive independent economic value from not being generally known or readily ascertainable through proper means. Tex. Civ. Prac. & Rem. Code Ann. § 134A.002.

Courts evaluate six factors to determine trade secret status: (1) the extent to which information is known outside the business, (2) the extent to which employees and others involved in the business know it, (3) measures taken to guard secrecy, (4) the information's value to the business and competitors, (5) effort or money expended in developing it, and (6) the ease or difficulty with which others could properly acquire or duplicate it. *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 926 F. Supp. 2d 935 (S.D. Tex. 2013), *Centennial Bank v. Holmes*, 717 F. Supp. 3d 542 (N.D. Tex. 2024). When evaluating these factors, the result overwhelmingly favors Defendants.

As a threshold issue, the Defendants did not download externally or use any of Plaintiffs' confidential information in creating and developing True.[7] This alone dooms Count III. As referenced therein, the purported "downloads" by Krzyzewski were actually uploads of her files to the LTC ACO database titled "Transitioned Executive". Similarly, the alleged download activity of the other Individual Defendants reflected in Exhibit G to the Complaint occurred in LTC ACO's closed-loop system and all such activities were in furtherance of the Individual Defendants' job duties or transition away from LTC ACO. Finally, as it relates to Ms. Bauer and Ms. Ward, the only documents transferred out of the LTC ACO ecosystem were personal in nature, and done with the permission and oversight of Genesis' Compliance Officer.

Fundamentally, Plaintiffs' claims must fail pursuant to their own definitions of the purported trade secrets and confidential information. "Plaintiffs bringing claims of trade secret misappropriation must identify with reasonable particularity, the alleged trade secrets at issue." *Topstone Commc'ns, Inc. v. Xu*, 729 F. Supp. 3d 701, 706 (S.D. Tex. 2024) (internal quotation omitted). Plaintiffs list several broad categories of trade secrets – insufficient to meet the specificity requirement when identifying trade secrets. *Am. Biocarbon, LLC v. Keating*, 2020 WL 7264459, at *5 (M.D. La. Dec. 10, 2020) (granting motion to dismiss complaint that alleged trade secrets in "broad, categorical terms, more descriptive of the types of information that generally may qualify as protectable trade secrets than as any kind of listing of particular trade secrets [the plaintiff] has a basis to believe actually were misappropriated."). To make matters worse, much of the alleged confidential information is general industry knowledge and not specific to LTC ACO. The existence of databases such as Milliman and CMS information repositories further undercuts Plaintiffs claim. *See DeWolff, Boberg & Assocs. Inc. v. Pethick*, 133 F.4th 448, 453 (5th Cir. 2025)

[7] As described herein, Krzyzewski's retention of documents was a contractual and legal requirement – but retention and use are not synonymous.

(granting summary judgment for defendant where purported trade secret included public information from databases).

Further, Plaintiffs have not demonstrated reasonable secrecy measures sufficient to maintain trade secret protection. Again, the MSSP regulatory framework and benchmarking methodologies are publicly available through CMS. The alleged confidential information is shared broadly among employees and contractors of Plaintiffs, *and* the client-facing terms of the agreements and financial compensation are available to those parties.

Lastly, Plaintiffs have not presented any evidence (because there is no evidence) that the Defendants are using any of Plaintiffs' confidential information. Plaintiffs are clinging to the purported download activity of Defendants without regard to whether the activity was in fact downloads, uploads, what documents were involved, and whether any confidential information was actually transferred out of LTC ACO. Without competent evidence to support their claims, Plaintiffs' trade secret misappropriation allegations rest on a theory of inevitable disclosure. Inevitable disclosure of trade secrets is highly disfavored. *Cardoni v. Prosperity Bank*, 805 F.3d 573, 589 (5th Cir. 2015) (collecting cases renouncing the inevitable disclosure theory).

*CAE Integrated, L.L.C. v. Moov Techs., Inc.*, 44 F.4th 257, 263 (5th Cir. 2022), is controlling. There, the court denied a preliminary injunction despite the former employee having access to trade secrets because there was no indication that he used them in his later position and the inference that the trade secrets were used because of the competitor's success was insufficient. *Id*. The court noted "CAE has not identified a single contact whose information was not publicly available or ascertainable through proper means. Semiconductor industry participants are available in third-party directories, meet at conventions and trade shows, and can be found though online

searches." *Id*. Further mitigating the risk to plaintiff, the defendant in *CAE Integrated* relinquished access to the relevant data before the hearing – so there was no threat of future use.

The same result is warranted here, given the plethora of publicly available information on the market. CMS and Milliman are only two sources of information publicly available to allow a new ACO to enter the market. The information in these databases made it feasible for True to develop its own projections and benchmark models. Almost every ACO has some method of projections and benchmarks, further undercutting the assumption that True must have used Plaintiffs' confidential information. Any documents retained by Krzyzewski pursuant to the Consulting Agreement are in counsel's possession (and have long been sequestered on a thumb drive in a safe) such that there is no threat of future use.

*iii. The Breach of Contract Claims Fail (Counts V-VIII)*

Plaintiffs' breach of contract claims also fail to demonstrate a likelihood of success on the merits. Their claims are purely based on conjecture and misconstrued contract interpretation. Plaintiffs must establish (1) the existence of a valid and enforceable contract, (2) performance by the plaintiff, (3) a breach of the subject contract by the defendant, and (4) the defendant's breach resulted in damages. *Montes v. Benelux Corp.*, 794 F. Supp. 3d 420, 425 (W.D. Tex. 2025).

***a. Breach of Contract as to Krzyzewski and Tremblant***

As against Krzyzewski and Tremblant, Plaintiffs' claims cannot survive. Krzyzewski was bound by the terms of the Consulting Agreement and the Amendment thereto. Ex. F to Compl. While the Consulting Agreement does contain a provision regarding confidentiality (section 8), the Agreement does not contain a non-solicit, non-compete or any similar restrictive covenants. Any allegations regarding Krzyzewski's "solicitation" of Genesis's employees will not succeed on the merits. Nor will Plaintiffs be able to succeed on the merits regarding a breach of section 8. Krzyzewski provided assurances that the documents she was *contractually and legally obligated*

to retain would not be used. Krzyzewski confirmed that she would abide by the confidentiality requirements in her agreement.[8] *See* Ex. A. Krzyzewski was able to successfully launch True through the use of her own personal knowledge (having done so once before, at LTC ACO), publicly available CMS databases and through the use of Milliman. There is no breach for Defendants to prove or be damaged by. Rather, Plaintiffs are attempting to use the Court to conjure a non-compete out of thin air. Such a result would not only restrict the Defendants' rights but would also implicate the rights of provider groups who have explicit non-exclusivity provisions in their contracts. This cannot stand.

***b. Breach of Contract as to Ford***

The claims against the Individual Defendants also fail. Ford was bound by the Non-Solicitation and Confidentiality Agreement (the "Ford Agreement"). Ex. D to Compl. The Ford Agreement contains a confidential information provision, as well as a non-disclosure and non-solicit. *Id*. Plaintiffs' claim that Ford breached the Ford Agreement is categorically false. Ford did not take personal possession of any downloads of LTC ACO information and therefore could not have disclosed or used anything for the business of True. All information used by True came from individual skill and knowledge, CMS public information, and Milliman's database.

Plaintiffs also present an incredible reading of the non-solicit in section 2 of the Ford Agreement, attempting to turn a narrow provision about solicitation of Genesis *employees* into a non-compete. A plain reading of the language preceding the excerpt cited by Plaintiffs demonstrates the narrow scope:

[redacted]

[8] Despite these assurances, as stated, Krzyzewski has sequestered any and all documents related to LTC ACO on a thumb drive and has since provided same to counsel. While Krzyzewski is legally required to maintain at least a subset of these documents pursuant to section 1395x(v)(1)(I) of Title 42 of the United States Code, such documents will remain in counsel's possession, custody, and control.

[redacted]

Ex. D to Compl. (*emphasis added*).

Plaintiffs' focus on the language Ford purportedly violated relates to the last provision of the non-solicit in the Ford Agreement – [redacted] But Plaintiffs' interpretation of this provision is not only inaccurate, it is nonsensical. The entirety of the provision at issue relates to the prohibition of soliciting Genesis employees to work or contract for a non-Genesis Health Care business partner. While poorly written, any ambiguity should be construed against Plaintiffs as the drafter of the Ford Agreement. Plaintiffs cannot demonstrate a breach of this provision and their efforts to persuade this Court that the language is a non-compete provision defy reason.

#### c. *Breach of Contract as to Ward*

Ward was bound by the terms of the Confidentiality, Non-Solicitation and Intellectual Property Agreement (the "Ward Agreement"). Ex. E to Compl. This agreement includes the same confidentiality and non-disclosure agreement, but also includes a more in-depth non-solicitation agreement. Ward did not breach the confidentiality provision because the only documents Ward removed from the LTC ACO ecosystem were her personal files, and were so removed at the direction of Genesis' Compliance Officer. Plaintiffs contend that Ward breached the non-solicitation provision prohibiting the: [redacted] Ex. E to Compl (*emphasis added.*) Critically, upon information and belief, LTC ACO's TIN contracts are not exclusive in nature. Rather, all provider

groups joining True have represented to True that they do not have exclusive relationships with any ACO or entity that would prevent them from participating in True's ACO.

CMS rules require exclusivity at the TIN level, but this does not create contractual exclusivity as to the individual providers and provider groups as TIN splitting is expressly permitted pursuant to 42 C.F.R. § 425.306(b)(2). Any outreach by True was done at the provider group level and not directed at LTC ACO's TINs. Therefore, Plaintiffs are unable to demonstrate a likelihood of success on the merits as to any of their breach claims.

*iv. The Tortious Interference Claims Fail (Counts X and XI)*

Plaintiffs' tortious interference claims must fail for the fact that there is no contractual, CMS, or other obligation or expectancy that a provider group operating with a certain ACO in one year will remain with that ACO in another year. There is no ongoing business expectancy where the market resets every calendar year. The existence of the CMS MSSP annual TIN addition and withdrawal process verifies that change is both anticipated and expected within ACOs from one year to the next. This is not a case where a provider group is locked into long-term obligations or relationships. *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1248 (5th Cir. 1985) ("A third-party's efforts to induce another to exercise his right to dissolve a contract at will or to terminate the contractual relations on notice does not constitute tortious interference with contract under Texas law.").

Provider groups have the right to choose which ACO to join – this is a necessary element in making the program successful. Indeed, not only do provider groups have the ability to choose with which ACOs they participate, but by design the CMS model provides the opportunity for providers to participate in multiple ACOs through TIN splitting. Upon information and belief, many of the provider groups are doing exactly that with a number of ACOs and different CMS models (*e.g.*, the new CMS CMMI LEAD ACO model).

Defendants' competition with Plaintiffs' ACO is legally permissible and thus not improper interference. As discussed above, Plaintiffs are unable to provide an underlying tort or contract breach sufficient to show improper interference. *Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 713 (Tex. 2001) ("to establish liability for interference with a prospective contractual or business relation the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful."). All that remains are Plaintiffs' unsupported assertions that Defendants somehow disparaged Plaintiffs to provider groups.

Contrary to this narrative, however, True has been explicit with potential provider groups that their shared savings with LTC ACO are *not* at risk due to the bankruptcy or otherwise. In fact, by way of example and not limitation, when asked by a potential provider group whether its 2025 shared savings through LTC ACO were at risk, Krzyzewski responded "Not at all. Or 2026." This is but one example of True's commentary to provider groups in stark relief to Plaintiffs' spurious claims of disparagement.

C. <u>Plaintiffs Have Not Demonstrated Irreparable Harm</u>

*i. Plaintiffs Delay in Bringing This Motion Makes Clear There is No Justification In Granting The Motion*

Plaintiffs have not shown that there is an extreme urgency which justifies an injunction. Delay by a plaintiff after learning of the threatened harm is an indication that the harm is not serious enough to justify a preliminary injunction. *BeatStars, Inc. v. Space Ape Ltd.*, 624 F. Supp. 3d 681, 687 (W.D. Tex. 2022); *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006); *Embarcadero Techs., Inc. v. Redgate Software, Inc.*, No. 1:17-cv-444-RP, 2017 WL 5588190, at *3 (W.D. Tex. Nov. 20, 2017) ("Plaintiffs' delay in seeking injunctive relief is fatal to their request for a preliminary injunction.").

Here, Plaintiffs' own Complaint undercuts the alleged need for a preliminary injunction as it lays out its own delay. Plaintiffs allege that LTC ACO "began immediately implementing their scheme to solicit LTC ACO's clients by using LTC ACO's trade secrets" as early as June 2026. Compl. ¶ 146; Mot. at 6. This timing is critical, as CMS accepted participant lists for the 2027 period from June 9, 2026 through June 23, 2026. Compl. ¶ 50. Following that deadline, CMS opens a request for information period where ACOs could modify their applications including correcting CMS identified deficiencies and adding additional TINs. Compl. ¶¶ 51,52. That period closed on August 5, 2026. *Id*. As of today's date, and the date of filing Plaintiffs' Motion, no participants can be added to *any* ACO, including LTC ACO or True. If Plaintiffs had legitimate concerns that the Defendants were using LTC ACO confidential information in True's CMS submissions, there was ample time before August 25th to bring their concerns to court and seek emergency relief.

Even further demonstrating Plaintiffs' delay, Plaintiffs' allegations regarding the Individual Defendants and alleged downloading of confidential information occurred *before* the individuals left LTC ACO. Clearly, Plaintiffs' purported concerns about Defendants' alleged LTC ACO-related document activities began on or before April of 2026. Compl. Ex. G ¶ 7. Plaintiffs' objective in seeking a PI this late in the CMS schedule is not to protect LTC ACO confidential information, but to effectively destroy Defendants' business to the point of no return.

*ii. Plaintiff Provides The Court With No Competent Evidence To Establish Irreparable Harm*

Plaintiffs provide no evidence beyond mere speculation to establish it will suffer irreparable harm without a preliminary injunction. While Plaintiffs speculate that they may face harm to business operations if Defendants utilize Plaintiffs' alleged confidential information, they must show that "the threatened harm is more than mere speculation." *Janvey v. Alguire*, 647 F.3d 585, 601 (5th Cir. 2011); *see also BioTE Med., LLC v. Jacobsen*, 406 F. Supp. 3d 575, 584 (E.D.

Tex. 2019) ("[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant."). Plaintiffs must show the harm is both *immediate* and *irreparable*. *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472 (5th Cir. 1985).

As an initial matter, equitable relief is unavailable where monetary damages are calculable and adequate. *Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir. Unit B 1981). "A party sufficiently proves that monetary damages are not adequate when it brings forward evidence, in the form of affidavits, declarations, or any other support, that shows imminent harm that is difficult to quantify." *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 697 (N.D. Tex. 2015). Plaintiffs have failed to meet this burden. On the contrary, Plaintiffs outline the methodology that they use every year to determine their expected profitability. Plaintiffs use this internal benchmark to predict CMS's payout – if an ACO's expenditures fall below the benchmark CMS sets, CMS sends the ACO a portion of the savings, whereas if expenditures exceed CMS's benchmark, the ACO may be required to repay a portion of the loss. Compl. ¶¶ 40-41.

As alleged, Plaintiffs' own benchmark methodology could be used to provide adequate compensation in the form of damages if Plaintiffs were to prevail: [redacted] Compl. ¶ 43. If Plaintiffs' theory proves true, they could recover their quantifiable and related losses for the 2027 financial year through monetary damages. *See e.g. Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (denying preliminary injunction where compliance costs could be calculated and recovered); *Watchguard Techs., Inc. v. Valentine*, 433 F. Supp. 2d 792, 794 (N.D. Tex. 2006)

(denying preliminary injunction where alleged misappropriation of trade secrets could be remedied through later monetary compensation).

Just as fatal to Plaintiffs' preliminary injunction is that the September 8 CMS deadline does *not* create irreparable harm – rather, it simply reflects Plaintiffs' own business decision urgency. First, and perhaps most importantly, CMS has mechanisms to identify overlapping participant TINs as part of its MSSP participant list review and validation process. This is one of the primary purposes behind the request-for-information phases. Potential overlaps may be identified through CMS review processes, CMS feedback, or communications with the ACO. In fact, an ACO is given a pop-up message when CMS identifies an ACO TIN overlap indicating that the TIN is currently participating in another MSSP ACO's Participant List. That pop-up even identifies the ACO that lists the overlapping TIN.

For renewing ACOs that include established TINs, the ACO is aware of overlap as soon as CMS opens the request for information portal (this year, falling on August 26, 2026). Simply put, Plaintiffs have full view of any overlap through CMS. And, despite the fact that these overlaps are made known to ACOs, including LTC ACO, True provided to LTC ACO a list of its submitted TINs to address Plaintiffs' purported concerns in advance of the hearing in this matter. And, out of the roughly 36 TINs submitted to CMS by True, only two overlapping TINs were located on the parties' TINs lists, further diminishing Plaintiffs' irreparable harm claims.

A glaring omission from Plaintiffs' allegations is that there is no incentive for a TIN to remain on two ACOs' participant lists. Indeed, should a TIN decline to choose one ACO to work with for the 2027 year, they are barred from participating under *either* ACO. Plaintiffs speculate that Defendants would not remove a TIN that decides not to proceed with True – ignoring the damning effect this would have on True's ability to negotiate with the TIN in the future and also

predict its ability to meet CMS's benchmarks for the calendar year. Such a practice would render True in violation of its provider contracts with provider groups.

Thus, Plaintiffs' catastrophizing over True's potential failure to remove an overlapping TIN is precisely the kind of ungrounded conclusion that warrants denial of a preliminary injunction. *See Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 583 (E.D. La. 2016), *aff'd sub nom*; *see also Monumental Task Comm., Inc. v. Chao*, 678 F. App'x 250 (5th Cir. 2017) ("[t]here must be more than an unfounded fear on the part of the applicant"). In essence, Plaintiffs admit that there may be no harm *at all* – the overlapping provider groups can voluntarily choose to remain with LTC ACO for the 2027 performance year entirely. *See Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) (preliminary injunction cannot be based on speculation of what third parties might do).

In reality, Defendants' lawful competition would not be the source of any potential suffering by Plaintiffs. Instead, Plaintiffs' bankruptcy filing poses a legitimate risk to provider groups. The bankruptcy filing is in the public domain and it is reasonable for provider groups to seek alternative ACOs to provide for their patients in times of such uncertainty. Underlying and inherent to Plaintiffs' financial struggles leading to bankruptcy are self-inflicted harms relating to the ACO's mismanagement. Accordingly, any alleged harm befalling Plaintiffs related to provider groups is a situation of its own making. *See e.g. State v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (holding that self-inflicted wounds are not irreparable injury).

All that remains to Plaintiffs' claim of irreparable harm is the contractual "irreparable harm" stipulations in the contracts executed by Krzyzewski, Ward, and Ford. But courts treat such provisions as only one factor in the overall analysis, and this factor cannot be dispositive of the

requirement to show irreparable harm. *Dickey's Barbecue Restaurants, Inc. v. GEM Inv. Grp., L.L.C.*, No. 3:11-CV-2804-L, 2012 WL 1344352, at *8 (N.D. Tex. Apr. 18, 2012).

D. The Balance of Hardships Favors Defendants

Even if Plaintiffs were able to establish entitlement to injunctive relief, which they cannot, the Court must also balance the equities. That is, it must determine the relative inconvenience to the parties and whether the burden upon the defendant should the injunction issue outweighs the burden to the plaintiff by denying same. *See In re OGA Charters, LLC*, 554 B.R. 415, 425 (Bankr. S.D. Tex. 2016) ("where harm to defendants is at least as great as the harm to plaintiffs a preliminary injunction on these facts will almost certainly guarantee greater harm for the defendants than failure to enjoin will bring to the plaintiffs.").

Plaintiffs' proposed preliminary injunction establishes an extreme remedy and one that would effectively destroy True's business essentially at its inception. This would create irreversible harm to Defendants. *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384 (5th Cir. 1984) is particularly instructive here. There, the plaintiff sought a preliminary injunction arguing they would suffer irreparable harm if the defendant, a competitor in children's country music television programs, continued to air its show in the market. The court denied the preliminary injunction, reasoning that while establishing the plaintiff's irreparable harm, so, too, did plaintiff establish that the defendants would suffer irreparable harm of at least the same magnitude as defendants.

Here, the harm Defendants would suffer should an injunction issue far exceeds any harm alleged by Plaintiffs. Extensive time and resources have been expended in the creation of True, and the Individual Defendants' entire livelihoods depend on their ability to work in this sector. True is at its inception and the 2027 performance year would be the first opportunity to recoup the significant investment made. A preliminary injunction preventing the Defendants from operating for the 2027 year would surely doom True. *See Acme Refrigeration Supplies, Inc. v. Acme*

*Refrigeration of Baton Rouge*, 961 F. Supp. 936, 941 (E.D. La. 1996) (finding balance of hardships weighed in favor of party that would interfere with the ability to earn a livelihood); *Visto Corp. v. Sproquit Technologies, Inc.,* 413 F. Supp. 2d 1073, 1093 (N.D. Cal. 2006) (denying motion for preliminary injunction where harms to the plaintiff "appear[ed] more theoretical or potential than actual or proven," while an injunction "would devastate [the defendant's] business"); *NMTC Corp. v. Conarroe*, 99 S.W.3d 865 (Tex. App.—Beaumont 2003, no pet.) (denying preliminary injunction where defendant would be put out of business if injunction were to issue, but if not the plaintiff "may lose some sales but the ability to mitigate these losses is within [plaintiff's] control and is subject to recoupment.").

Crucially, the balance of the equities in favor of Defendants extends to most, if not all, of its contracted provider groups and the Medicare beneficiaries to which they provide care. That is, if an injunction issues and True is forced to shutter, many of its already-contracted provider groups would be left without *any* ACO participation. As the CMS deadline to join an ACO expired on August 5, 2026, provider groups who contracted only with True would have nowhere else to turn for the 2027 performance year.

E. <u>The Public Interest Weighs Against The Requested Relief</u>

While there is a public interest in the protection of confidential information, no confidential information was used in developing or operating True. Instead, True established a competing healthcare platform with publicly and commercially available information in order to provide providers and their patients with another option in the MSSP marketplace. Case law within the Fifth Circuit overwhelmingly establishes that a preliminary injunction that imposes restrictions on healthcare choices generally weighs against the public interest. *In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686 (Tex. 2015) (holding a competitor's ability to compete was contingent on its reputation and relationships such that conduct casting doubt on the new competitor's services

injured both the competitor and the public interest in competitive healthcare markets); *Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 570 (Tex. App.—Austin 2000, no pet.) (affirming temporary injunction preventing closure of woman's hospital where the public interest in patient access to healthcare services was a decisive factor in the equitable analysis); *HTI Health Servs., Inc. v. Quorum Health Grp., Inc.*, 960 F. Supp. 1104, 1130 (S.D. Miss. 1997) (denying preliminary injunction where merger would result in better medical services for the community).

It is against this legal backdrop that Plaintiffs seek to restrict provider groups' ability to freely choose the ACO that would best serve their patients. Not only would the relief requested negatively impact provider groups, but it also would leave thousands of vulnerable Medicare beneficiaries who reside in long-term care nursing homes and assisted living facilities across the county without the benefits of their providers' ACO.

With this, continuity of care, a critical element of ensuring best outcomes for patients, would be disrupted. The relief requested would operate in essence as a restrictive covenant against the *providers.*[9] These are providers who should not only have the freedom to choose their partner ACO, but who have previously negotiated non-exclusivity provisions in their provider contracts (without which, arguably, they would not have participated with LTC ACO in the first place).

August 5, 2026 was the final deadline for an ACO to add a participant TIN to its participant list for the 2027 performance year. Compl. ¶ 52. That fact alone demonstrates the severity of the risk to the public should the court issue a preliminary injunction. If a participant TIN is listed on True's participant list alone (i.e., there is no overlap with another ACO) they would have no alternative to join an ACO for the 2027 calendar year. Such a result would directly contradict the goals of the MSSP program, which was created to bring groups of doctors and other health care

[9] Texas has recently introduced legislation for more stringent requirements for physician non-competes, including limiting the geographic scope and time limits that are permissible. *See* Texas SB 1318.

providers together to "collaborate to give coordinated high-quality care to people with Medicare, focusing on delivering the right care at the right time, while avoiding unnecessary services and medical errors."[10] The result Plaintiffs seek is simply not a result that public policy supports. And, as mentioned, as only two provider TINs overlap between True and LTC ACO, meaning that all other provider TINs that have chosen to participate with True without an alternative ACO would be banished from participating in the MSSP program for 2027.

CMS policies actively encourage a competitive ACO market and participation in ACOs, particularly for highly skilled healthcare administrators.[11] CMS's policy ultimately supports the conclusion that the public interest too, favors competition in the ACO marketplace, particularly for Medicare beneficiaries in long-term care who benefit from having more ACO options. The injunction proposed by Plaintiffs would prevent the free mobility of skilled healthcare administrators and their ability to provide for their patients. The health, and in some cases the survival, of Medicare beneficiaries would negatively be impacted by a TIN being unable to operate under an ACO and service their patients. Such a result is clearly contrary to the public interest.

F. The Requested Relief is Overbroad

As discussed herein, the preliminary injunction proposed by Plaintiffs would effectively shutter Defendants' budding business rather than providing narrowly tailored relief. In light of the public availability of provider groups, as well as Defendants' historic relationships with provider groups, if any relief is warranted (it is not), such an order should be narrowly limited to specifically identified trade secrets and documents, not a blanket prohibition on competition and solicitation. *See e.g. TMRJ Holdings, Inc. v. Inhance Technologies, LLC*, 540 S.W.3d 202 (Tex. App.—Houston

---

[10] https://www.cms.gov/medicare/payment/shared-savings-program.

[11] https://www.cms.gov/newsroom/fact-sheets/2026-medicare-accountable-care-organization-initiatives-participation-highlights; see also https://www.cms.gov/newsroom/press-releases/cms-proposes-transformational-medicare-reforms-expand-accountable-care-modernize-physician-payment.

[1st Dist.] 2018, no pet.) (an injunction "must not be so broad that it would enjoin a defendant from acting within its lawful rights" and is "impermissibly overbroad if it prohibits not only the use of confidential and proprietary information, but lawful conduct as well."); *Reliant Hosp. Partners, LLC v. Cornerstone Healthcare Grp. Holdings, Inc.*, 374 S.W.3d 488 (Tex. App.—Dallas 2012, no pet.) (holding an injunction may protect specific confidential information but cannot function as a non-compete restriction suppressing all competitive activity); *Cooper Valves, LLC v. ValvTechnologies, Inc.*, 531 S.W.3d 254 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (holding an injunction must be limited to specific, identified information rather than sweeping in broad categories of what the plaintiff considers confidential).

G. <u>If A Preliminary Injunction Is Entered, an Injunctive Bond Should be Ordered</u>

Injunctions are considered extraordinary remedies even when granted upon a full and final hearing and are more extraordinary when granted without notice and without bond. *Continuum Co. v. Incepts, Inc.*, 873 F.2d 801, 804 (5th Cir. 1989). In this instance, it is proper for the bankruptcy court, in its discretion, to fully comply with Federal Rule of Civil Procedure 65(c). The bond can be used as payment of costs and damages that may be incurred or suffered by any party found to be wrongfully enjoined or restrained. *Nicholas v. Alcatel USA, Inc.*, 532 F.3d 364, 379 (5th Cir. 2008). Thus, in the event that injunctive relief is granted, the Court should require Plaintiffs to post bond for the costs and damages that may be incurred or suffered by Defendants should they be found to be wrongfully enjoined or restrained.

## IV. CONCLUSION

Defendants respectfully request that Plaintiffs' Motion for Preliminary Injunction be denied.

Dated: September 2, 2026

Respectfully submitted,

*/s/ Scott D. Lawrence*

Jason M. Rudd, Tex. Bar No. 24028786
Scott D. Lawrence, Tex. Bar No. 24087896
WICK PHILLIPS GOULD & MARTIN, LLP
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Email: jason.rudd@wickphillips.com
scott.lawrence@wickphillips.com

Emily Wilbur (admitted *pro hac vice*)
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone: (312) 212-4949
Email: ewilbur@beneschlaw.com

Noelle Torrice (admitted *pro hac vice*)
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
1313 N. Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7010
Email: ntorrice@beneschlaw.com

**COUNSEL TO KRISTEN KRZYZEWSKI, TREMBLANT CONSULTANTS, LLC, TRUE LTC LLC, TRUE LTC LEAD ACO, LLC, TRUE LTC HOLDINGS GROUP, LLC, TRUE LTC ADMINISTRATIVE SERVICES, LLC, CAROL BAUER, RYAN ROMANO, JILL FORD, AND MAUREEN WARD**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on September 2, 2026, a true and correct copy of the foregoing document was served by the Court's ECF noticing system on all parties that consent to such service via electronic filing.

*/s/ Scott D. Lawrence*
Scott D. Lawrence