**MCDERMOTT WILL & SCHULTE LLP**
Charles R. Gibbs (TX Bar No. 7846300)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
Email: crgibbs@mcdermottlaw.com

*Counsel for the Debtors and Debtors-in-Possession*

**MCDERMOTT WILL & SCHULTE LLP**
Daniel M. Simon (admitted *pro hac vice*)
Daniel-Charles Wolf (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
Email: dsimon@mcdermottlaw.com
dcwolf@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Nathan Bull (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131-2184
Telephone: (305) 358-3500
Facsimile: (305) 347-6500
Email: nbull@mcdermottlaw.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>GENESIS HEALTHCARE, INC., et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-80185 (SGJ)<br><br>(Jointly Administered) |
| LTC ACO LLC and GENESIS HEALTHCARE, INC.,<br><br>Plaintiffs,<br><br>v. | Adv. Proc. No. 26-08012 (SGJ)<br><br>**Related to Docket Nos. 2, 32** |

[1] The last four digits of Genesis Healthcare, Inc.'s federal tax identification number are 4755. There are 299 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Genesis. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

KRISTEN KRZYZEWSKI, an individual; TREMBLANT CONSULTANTS, LLC, a Maryland limited liability company; TRUE LTC LLC, a Wyoming limited liability company; TRUE LTC LEAD ACO, LLC, a Wyoming limited liability company; TRUE LTC HOLDINGS GROUP, LLC (f/k/a LEAD LTC Holdings Group, LLC), a Wyoming limited liability company; TRUE LTC ADMINISTRATIVE SERVICES, LLC, a Wyoming limited liability company; CAROL BAUER, an individual; RYAN ROMANO, an individual; JILL FORD, an individual; MAUREEN WARD, an individual.

Defendants.

**REPLY IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs Genesis HealthCare, Inc., Genesis Healthcare LLC, and LTC ACO, LLC (collectively, the "Plaintiffs") respectfully submit this reply in further support of the *Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction* (the "Motion") [Docket No. 2] and in response to the *Defendants' Opposition to Plaintiffs' Emergency Motion for Preliminary Injunction* (the "Opposition") [Docket No. 32].

## PRELIMINARY STATEMENT

1. This dispute is critical to the estates and potentially impacts the value to be transferred to 101 W State Street Holdings, LLC ("WSSH"), the Court-approved purchaser of substantially all of the Debtors' assets. The September 8, 2026 CMS deadline is only six days away; after that date, participant rosters lock for the 2027 performance year and the harms caused by Defendants' actions become permanent.

2. Defendants' Opposition casts aside Plaintiffs' allegations as marketplace competition, nothing more. Far from it. Defendants are former officers of LTC ACO, Ms. Krzyzewski was on the board of managers of LTC ACO, and this Court-approved a profit- sharing bonus plan to these same insiders (including a seven-figure profit-share to Ms. Krzyzewski), relying on the representation that the individuals referenced therein were "crucial" to the success of the business and noting that its business model "is built on relationships." *Perry Decl.* ¶ *23* [Docket. 1308-2].[2] Mere months later, these same "crucial" insiders left the Debtors' estates, downloaded confidential information constituting property of the estate, and deployed those relationships and knowledge to the detriment of the estates. As demonstrated below, this is a flagrant and willful violation of the automatic stay, reflecting insider[3] self-dealing during a bankruptcy proceeding, on the eve of a value-maximizing sale to WSSH.

---

[2] In October 2025, the Debtors filed the *Expedited Motion for Order Pursuant To 11 U.S.C. §§ 363 and 503 (I) Authorizing the Debtors to Pay LTC ACO Profit-Sharing Payment and (II) Granting Related Relief* (the "Profit-Sharing Motion") [Docket No. 1308], pursuant to which the Debtors disclosed "out of an abundance of caution" that one of the payment recipients, Krzyzewski, was "a statutory insider of LTC ACO." *Profit-Sharing Mot.* ¶ 24. This Court approved the profit-sharing arrangement on that basis on November 6, 2025 [Docket No. 1530],

[3] The Opposition attempts to characterize Krzyzewski as merely an independent contractor under the Tremblant Consulting Agreement—not an officer or director—and therefore not a statutory insider. Yet, Krzyzewski was an Acting President, and a manager of LTC ACO's board of managers (therefore, a director). Section 101(31)(B) expressly enumerates officers, directors, and persons in control of a corporate debtor as insiders. Krzyzewski's insider status is not a matter of characterization; it is a judicial admission in this Court's record. The Profit-Sharing Motion was filed "out of an abundance of caution and because one of the recipients of payments is a statutory insider of LTC ACO." Profit-Sharing Mot. ¶ 24. The Declaration submitted contemporaneously with the Profit- Sharing Motion identified Krzyzewski as "Contractor: Head of Strategy & Program Development, principal of Tremblant Consultants LLC, and member of the LTC ACO board of directors." Perry Decl. ¶ 17. This Court approved the profit-sharing payment on that basis. Krzyzewski cannot now disclaim the status the Debtors represented and this Court relied upon.

## DISCUSSION

### I. The Defendants Violated the Automatic Stay

3. Defendants seek to advance the proposition that CMS participant data is publicly available and thus, not property of the estate. The fact that CMS participation data is publicly available is true, but irrelevant. Plaintiffs do not contend, and have never contended, that a listing of current ACO participants is a trade secret. The Debtors are well aware that CMS publishes that data. However, that is not the property right at issue. Instead, what is at issue falls into two categories, both of which clearly constitute property of the estate under Bankruptcy Code section 541(a) and applicable caselaw.

4. Section 541(a) is "all-embracing," and includes "name, relationships with customers and parties dealing with the debtor, goodwill, and telephone numbers." *West v. Hsu (In re Advanced Modular Power Sys.)*, 413 B.R. 643, 670 (Bankr. S.D. Tex. 2009). Intangible property interests, including customer relationships and proprietary business intelligence, are swept into the estate at filing. *See In re ALERT Holdings*, 148 B.R. 194, 203 (Bankr. S.D.N.Y. 1992) ("[T]he record plainly establishes that they utilized Alert's customer list and attempted to harm its goodwill, all with the aim of obtaining possession and exercising control over property which is property of the estate. Accordingly, the conclusion is virtually inescapable that they have violated the automatic stay.").

5. ***First,*** LTC ACO maintained internal pipeline targets, spreadsheets containing leads, and recruitment strategies identifying providers being actively recruited for the upcoming performance year. This proprietary business information is not published by CMS, Milliman, or anyone else, because it reflects LTC ACO's business judgment about which providers present commercially viable business opportunities for the Debtors. CMS publishes raw shared savings; it does not publish financial analyses, projections, or the like. Through their status as insiders, the

Defendants gained access to LTC ACO's proprietary analysis of the data CMS publishes (*e.g.*, internal benchmarks, savings estimates, pricing strategies, and client-specific projections). The existence of raw public data does not make LTC ACO's derivative analysis public any more than the existence of public stock prices makes a hedge fund's trading models unprotectable. These contractual rights, ACO participant agreements, and other proprietary business information are all property of the Debtors' estates, being leveraged *against* the Debtors by former insiders.

6. ***Second***, LTC ACO's institutional goodwill is at risk. As articulated by the Supreme Court in *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555–56 (1993), goodwill is "the expectancy of continued patronage." LTC ACO's renewal rates, its relationship intelligence, and the very systems that generate continued patronage are business goodwill under section 541 of the Bankruptcy Code—and they are precisely what the Purchaser is paying for. *See In re Biolitec, Inc.*, 2015 Bankr. LEXIS 228, at *33-34 (Bankr. D.N.J. 2015) (holding that defendants "violated the automatic stay when they formed New Biolitec for the purpose of continuing Debtor's business and began using the Debtor's customer information and goodwill to sell products formerly provided by the Debtor . . . .").

7. The Seventh Circuit's decision in *In re Uniservices, Inc.* is also instructive. 517 F.2d 492 (7th Cir. 1975). There, the court emphasized that "more than customer identity [sic] more than a mere list of names and addresses is involved here. The data extends to particular requirements, preferences, and habits of individual customers." *Id.* The Seventh Circuit went on to state: "It is of no import that [the former officer] consistently refused to recognize that duty and refused to agree not to compete and not to solicit Crystal's customers for a limited period." Rather, "he (employee) occupies a confidential relation to appellee (employer), and in such case the law raises an implied contract between them that the employe will not disclose any trade secret

imparted to him or discovered by him in the course of his employment. A disclosure of such secrets thus acquired is not only a breach of contract on his part, but is a breach of trust which a court of equity will prevent." *Id.* at 497. So too here. The Defendants did not merely take a list of TINs; they instead took eleven years of institutional knowledge about provider preferences, relationship dynamics, savings performance, and growth potential.

8. Defendants' conduct also directly interferes with estate property in the form of contractual rights under the pending sale to WSSH. The goodwill being transferred is diminished every day Defendants divert participants. This is not merely competitive harm—it represents potential diminution of estate value through willful violations of the automatic stay and brazen thefts of corporate intangibles and goodwill. Actions taken in violation of the automatic stay are voidable, not void *ab initio*, meaning that they have no valid legal effect *unless and until* a court exercises its discretion to validate them. *Sikes v. Global Marine, Inc.*, 881 F.2d 176, 178 (5th Cir. 1989); *Jones v. Garcia (In re Jones)*, 63 F.3d 411, 412 (5th Cir. 1995); *see also Morton v. Kievit (In re Vallecito Gas, LLC)*, 461 B.R. 358, 389 (Bankr. N.D. Tex. 2011) (Houser, J.) (the court held that a post-petition assignment in violation of the stay "was, and remains, invalid unless the stay is annulled under § 362(d) or some exception to the automatic stay applies.") No such relief has been requested by Defendants, nor would it be equitable to grant such relief given the egregious facts here.

## II. Defendant Insiders Exploited the Debtors' Corporate Opportunities

9. The Defendants' suggestion that Krzyzewski's resignation severed her obligations to the estate is legally unfounded. A fiduciary's duty of loyalty does not evaporate upon departure, particularly where, as here, the departing insiders brazenly download confidential information belonging to the Debtors' estates and immediately deploy it in competition with the estate. *See In re Uniservices, Inc.*, 517 F.2d at 497 (former officer estopped from denying trade-secret status of

data she treated as confidential during tenure); *In re Infinity Bus. Group, Inc.*, 2012 WL 5420410 (Bankr. D. S.C. 2012) (preliminary injunction granted where former COO took debtor data to launch competitor during bankruptcy). Krzyzewski's pre-departure recruitment of the other Individual Defendants compounds the breach. *See Golden Distribs., Ltd. v. Auburn Merch. Distrib., Inc.*, 134 B.R. 750, 756 (Bankr. S.D.N.Y. 1991) (finding that a managerial employee's pre-departure recruitment of coworkers to a competitor constitutes breach of fiduciary duty of loyalty).

10. More fundamentally, what Defendants have done is usurp corporate opportunities belonging to the estate. This is not simply about the use of particular documents. It is about what Defendants *learned* as insiders—which providers were the strongest shared-savings performers, which relationships were most valuable, and where the growth opportunities lay—and are now exploiting for their own benefit. Those corporate opportunities belong to LTC ACO's estate, and not to former insiders seeking to leverage such information for their own personal benefit. *See West v. Hsu (In re Advanced Modular Power Sys.)*, 413 B.R. 643, 667 (Bankr. S.D. Tex. 2009).

**III. Plaintiffs Remain Likely to Succeed on the Merits**

11. Defendants attempt to re-frame Krzyzewski's downloads as transfers to an LTC ACO database that she completed as part of her transition process. However, forensic records offer some clarity into the "upload" process alleged by Krzyzewski. Although Defendants admit that Krzyzewski downloaded information onto a personal device, Defendants do not contend that she later deleted these files from her personal drive. In fact, Defendants readily admit that the files Krzyzewski downloaded remain on a thumb drive that is locked in a safe to ensure "no threat of ***future*** use." (Opp. at 12.)

12. Additionally, Defendants contend that "the vast majority of the categories of confidential information allegedly downloaded is available on CMS or paid databases such as

Milliman." (Opp. at 9.) Defendants do not address whether the specific files named in the Plaintiffs' TRO Brief, (TRO Brief at 5) are publicly available, nor can they allege with certainty that all of the information downloaded is available through alternative, legal sources. They instead make the exact kinds of "broad" and "sweeping" assertions that they allege of Plaintiffs.

13. Defendants also cite *Topstone Commc'ns, Inc. v. Xu*, 729 F. Supp. 3d 701, 706 (S.D. Tex. 2024) for the assertion that "Plaintiffs bringing claims of trade secret misappropriation must identify with reasonable particularity, the alleged trade secrets at issue." The rest of *Topstone* proves instructive. The court goes on to say that "plaintiffs need not identify specific trade secrets in their pleadings," but instead must simply "describe the trade secrets with enough clarity for defendants to understand how each claimed trade secret differs from information in the public domain." *Topstone*, 729 F. Supp. 3d at 706. And the trade secrets alleged in *Topstone* were far more vague and general than those alleged by Plaintiffs in this case. The *Topstone* plaintiffs alleged that the Topstone defendants "stole or attempted to steal Topstone's customers informing them to order their products directly from ZCTT" and that they "misappropriated Topstone's customer list and have or are attempting to divert purchase orders from Topstone's customers." This pales in comparison to the trade secrets described and alleged by Plaintiffs in their complaint. *See* Compl. ¶ 64.

14. Defendants also mischaracterize the holding in *DeWolff, Boberg & Assocs. Inc. v. Pethick* as "granting summary judgment for defendant where purported trade secret included public information from databases." (Opp. at 10-11 (citing 133 F.4th 448, 453 (5th Cir. 2025))). This incorrectly suggests that the mere presence of an alleged trade secret in a database defeats the trade secret claim. Not so. Instead, the Fifth Circuit held that the Plaintiffs' fatal error was failing to identify which specific records in the database were trade secrets, and instead generally

describing the alleged trade secrets as "(1) confidential contact information" for three specific entities, "(2) demographic information, historical information, notes from prior meetings, and notes regarding specific needs or issues," and "(3) documents and ESI containing confidential information related to business opportunities." In other words, the DeWolff plaintiffs' lack of specificity was the issue—not the existence of the alleged trade secrets in a database. And again, Plaintiffs described LTC ACO's trade secrets in much greater detail than the *DeWolff* plaintiffs.

15. In response to Plaintiffs' breach of contract claims, Defendants rely primarily on varying interpretations of the Consulting Agreement, Ford Agreement, and Ward Agreement. They first contend that the Consulting Agreement requires Krzyzewski to maintain her records, and that this negates Section 8 of the Consulting Agreement, which governs Confidential Information. Section 8, however, states she cannot *utilize, distribute, copy, or disclose* Confidential Information, and Plaintiffs allege that Krzyzewski breached the agreement by utilizing and using the confidential information for the benefit of True. Defendants' Opposition Brief does not address these allegations, and instead inaccurately attempts to re-frame Plaintiffs' argument as based in her mere possession of the records.

16. Further, Defendants argue that Ford did not download any confidential information from LTC ACO (only private/personal information) and therefore did not breach Section 1(b) of the Ford Agreement, which forbids her from disclosing confidential information. But Ford's download history says otherwise; several documents she downloaded had visibility settings of "Shared internally" or "Shared externally," as opposed to "Private." *See* Compl. Ex. G at 136. Further, Defendants respond to Ford's breach of Section 2 by emphasizing Section 2's language forbidding Ford from "employ[ing] or solicit[ing] for employment," which they contend Plaintiffs are trying to transform into a non-compete argument. But Defendants ignore Section 2's drafting

structure. Section 2 forbids Ford from employing or soliciting for employment, *and* pursuing contractual relationships or work agreements with non-Genesis partners. These are two separate requirements, and Ford has breached the second.

17. Defendants also emphasize that Ward's agreement only forbids solicitation with any current or prospective LTC ACO client with whom LTC ACO has an "exclusive" contractual relationship. Defendants argue that "upon information and belief, LTC ACO's TIN contracts are not exclusive in nature," and that "any outreach done by True was done at the provider group level and not directed at LTC ACO's TINs." But Ward's intent in soliciting LTC ACO clients does not resolve her breach. Defendants, as former high-level officers at LTC ACO, are certainly aware that LTC ACO has several exclusive contractual relationships. And at least one of LTC ACO's participants has terminated some of their TINs from LTC ACO's list and migrated them to True's. Defendants do not (and cannot reasonably) dispute that this amounts to Ward breaching her agreement with Plaintiffs.

18. And finally, in response to Plaintiffs' tortious interference with business claims, Defendants essentially argue that they should be allowed to compete in a free market. They further add that Krzyzewski, while working for True, informed a potential provider group that their shared savings with LTC ACO were not at risk for 2025 or 2026. Yet at least one provider group explicitly informed LTC ACO that True had raised Genesis's bankruptcy as a concern, and shortly thereafter, several other provider groups began raising the same concerns. Plaintiffs' tortious interference claims, therefore, are not the "spurious claims of disparagement" that Defendants allege—they are rooted in information obtained directly from the providers True attempted to solicit.

## IV. Plaintiffs Did Not Delay

19. Courts regularly recognize that a delay stemming from good-faith negotiations is not per se unreasonable. *See Compass Bank v. Dixon*, No. H-17-1576, 2018 WL 6733018, at *6

(S.D. Tex. Nov. 16, 2018) ("The delay in seeking injunctive relief . . . does not, in and of itself warrant the denial of the injunctive relief sought."). The cases Defendants cite similarly fail to demonstrate an unreasonable delay, as they involve delays far exceeding the amount of time Plaintiffs spent crafting their Complaint and TRO Motion. *See BeatStars, Inc. v. Space Ape Ltd.*, 624 F. Supp. 3d 681, 686 (W.D. Tex. 2022) (involving a delay of two years); *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 607 (N.D. Tex. 2006) (waiting until five months after filing complaint to seek preliminary injunction); *Embarcadero Techs., Inc. v. Redgate Software, Inc.*, No. 1:17-cv-444-RP, 2017 WL 5588190, at *3 (W.D. Tex. Nov. 20, 2017) (involving a delay of more than six months between learning of Defendants' conduct and filing suit).

20. The short lapse in time before Plaintiffs brought suit is not an "unreasonable delay." As Defendants note in their Opposition Brief, Plaintiffs were not aware of Defendants' unlawful conduct until late June 2026. Plaintiffs then attempted to resolve the dispute amicably by sending a cease-and-desist letter on June 30, 2026 and negotiating with Defendants in good faith throughout July. Plaintiffs then realized Defendants were not going to be willing to resolve this dispute amicably and began preparing to file the instant lawsuit. In sum, this "delay" amounted to no more than two months—and even less when considering the Parties' negotiations took place during much of this time. This is less time than any of the cases Defendants cite in their brief as support for Plaintiffs' delay being "unreasonable."

21. Further, the September 8 deadline creates a new irreparability inflection point. As discussed in the TRO Brief and Complaint, September 8, 2026 is the final day for ACOs to modify their participant list, and TINs appearing on multiple lists can be terminated from each list on which they appear. Although Defendants argue that many of the provider groups participating with True do not have exclusive TIN agreements and therefore may overlap with other ACOs,

Defendants do not and cannot allege with confidence that LTC ACO will not lose *any* TINs as a result of overlap. Indeed, Defendants admit that there are two overlapping TINs, which they attempt to downplay by noting that one of the TINs only has 21 assigned lives. Defendants do not, however, acknowledge the second overlapping TIN, or the fact that significant harm may result even from the loss of these two TINs—both to LTC ACO and its remaining participants.

## V. The Balance of Hardships and Public Interest Favor Injunctive Relief

22. Lastly, despite Defendants' contention, the requested relief does not prevent the overlapping TINs from participating in MSSP for PY 2027. Because these TINs overlap, they do not "have no alternative" as Defendants suggest. Instead, these TINs would appear on LTC ACO's list, and True would maintain any TINs that they acquired without the use of LTC ACO's trade secrets and violations of the automatic stay. The balance of hardships and public interest therefore favor Plaintiffs.

[*Remainder of Page Intentionally Left Blank*]

**CONCLUSION**

23. For these reasons, and those set forth in the Motion, the Plaintiffs respectfully request that the Court grant the relief requested in the Motion, and grant such other and further relief as is just and proper.

Date: September 3, 2026
Dallas, Texas

**MCDERMOTT WILL & SCHULTE LLP**

*/s/ Daniel-Charles V. Wolf*
Charles R. Gibbs (TX Bar No. 7846300)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
Email: crgibbs@mcdermottlaw.com

-and-

Daniel M. Simon (admitted *pro hac vice*)
Daniel-Charles V. Wolf (admitted *pro hac vice*)
**MCDERMOTT WILL & SCHULTE LLP**
444 W. Lake Street, Suite 4000
Chicago, IL 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
dsimon@mcdermottlaw.com
dcwolf@mcdermottlaw.com

- and -

Nathan Bull (admitted *pro hac vice*)
**MCDERMOTT WILL & SCHULTE LLP**
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131
Telephone: (305) 358-3500
Email: nbull@mcdermottlaw.com

*Counsel for Debtor Plaintiffs*

**CERTIFICATE OF SERVICE**

I do hereby certify that on the date hereof, a true and correct copy of the foregoing was served via the Court's CM/ECF system to all parties authorized to receive electronic notice in this case.

*/s/ Charles R. Gibbs*
Charles R. Gibbs