CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 8, 2026**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| GENESIS HEALTHCARE INC., et al,[1] | § | Case No. 25-80185 (SGJ) |
| Debtors. | § | (Jointly Administered) |
| LTC ACO LLC; GENESIS HEALTHCARE, INC.; GENESIS HEALTHCARE LLC, | § | |
| Plaintiffs, | § | Adv. Proc. No. 26-08012 (SGJ) |
| v. | § | |
| KRISTEN KRZYZEWSKI; TREMBLANT CONSULTANTS, LLC; TRUE LTC LLC; TRUE LTC LEAD ACO, LLC; TRUE LTC HOLDINGS GROUP, LLC (f/k/a LEAD LTC HOLDINGS GROUP, LLC); TRUE LTC ADMINISTRATIVE | § | |

[1] The last four digits of Genesis Healthcare Inc's federal tax identification number are 4755. There are 299 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Genesis. The location of Genesis Healthcare Inc.'s corporate headquarters and the Debtors' services address is 101 East State Street, Kennett Square, PA 19348.

| | |
|---|---|
| SERVICES, LLC; CAROL BAUER; RYAN ROMANO; JILL FORD; MAUREEN WARD, | § |
| | § |
| Defendants. | § |

---

**BENCH RULING ON PLAINTIFFS' EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DE # 2]**

The adversary proceeding (the "Action") now before the court involves, as Plaintiffs, the following three Chapter 11 Debtors: LTC ACO LLC ("LTC ACO"); Genesis Healthcare LLC ("Genesis LLC"); and Genesis Healthcare, Inc. ("Genesis Inc," together with LTC ACO and Genesis LLC the "Plaintiffs" or "Debtors").

## I. BACKGROUND

The Plaintiff that is the most relevant to the current Action is LTC ACO. What is an "ACO" in the healthcare space? It is an "accountable care organization," which is a network of doctors and other entities who provide treatment to patients on Medicare. An ACO submits an application, on an annual basis, to participate in a program known as the Medicare Shared Savings Program ("MSSP") with the Centers for Medicare & Medicaid Services ("CMS"). As part of this process, it submits, in accordance with certain deadlines, a list of medical providers ("ACO Participant List") that are part of their network (showing, among other things, the tax identification numbers, or "TINs" for such providers). For purposes of this Action, and a requested injunction being sought, the relevant deadline is September 11, 2026, for the 2027 calendar year. The concept behind the ACO model is, generally stated, to manage, through the ACO, the quality and costs of the providers within the ACO network and to meet certain benchmarks and targets identified by CMS. If such benchmarks and targets are achieved, it can result in payments from CMS to the ACO, which will be shared among the ACO participants. LTC ACO has been an industry leader

in this area—its ACO participants are both Debtors in the Genesis family of companies, as well as wholly unrelated doctors, primary care practices, and other participants. The Debtors' Co-Chief Restructuring Officer ("CRO") credibly testified that he thought the Debtors' ACO business is roughly 10-12% of the Debtors' overall value.

The Defendants in this Action are Kristen Krzyzewski ("KK") and four other former executive level employees of LTC ACO—namely, Maureen Ward ("Ward"), Jill Ford ("Ford"), Ryan Romano ("Romano"), and Carol Bauer ("Bauer" together with KK, Ward, and Ford, the "Individual Defendants")—and also certain business entities with which these individuals are associated (most of which were only formed in 2026). The Individual Defendants were essentially the core operating team at LTC ACO—seemingly acting as both the work team and the executives—and they now operate a competing ACO known as "True" that is just getting started. This Action, in summary, alleges that the Individual Defendants (most especially KK) misappropriated documents and trade secrets from LTC ACO to form the rival company True. While multiple causes of action are set forth in the Action, the issue before the court now—brought via a request for a TRO and preliminary injunction—is whether KK and the other Defendants violated the Bankruptcy Code's automatic stay (namely section 362(a)(3)), by exercising control over property of the estate (i.e., the books, records, allegedly confidential models, projections, client information, contracts, trade secrets, and goodwill of the Debtors)—in the process of creating and starting to operate True. As a specific remedy at this preliminary stage, the Debtors seek to have the court declare that 10 of the participants on True's ACO Participant List,[2] which have been described as overlapping participants with providers that are on LTC ACO's ACO Participant List (hereinafter, the "10 Overlapping Participants"), were obtained through this

[2] Pl.'s Ex. 28, DE # 37-1.

automatic stay violation and, thus, any agreements between participants and True, as well as their placement on True's ACO Participant List should be deemed to be voidable and ineffective. All other relief requested by the Debtors in the Action would be deferred to a later trial on the merits.

The court heard extensive evidence on September 3, 2026, through four different witnesses and admitted over a dozen documents. There is no question (and no party disputes) that the books, records, trade secrets, contractual rights, and concept of goodwill are property of the estate, as contemplated by section 541 of the Bankruptcy Code. There is also no question that the Defendants had access to such estate property throughout their tenure with LTC ACO and, at least in the case of KK, to some degree even after she left LTC ACO. The disputed fact question is whether the Defendants exercised control over the books, records, trade secrets, contractual rights, and goodwill of the Debtor in violation of the automatic stay—using them to form a competing company.

The four witnesses that provided live testimony to the court, and their testimony, are summarized below.

**Witness #1, Teresa S. Molsbee**. Ms. Molsbee is the Chief Compliance officer for LTC ACO. Ms. Molsbee credibly gave a brief overview of how the concept of an ACO works in the healthcare space and, specifically, regarding how things work at LTC ACO. She mentioned, among other things, that the Debtor, LTC ACO, has contractual relationships with all of its ACO participants, the terms of which are one year in length, and they are evergreen in nature (i.e., they automatically renew if not terminated). A sample form of the agreement was not submitted into evidence. She also explained some of the relevant deadlines for ACOs and the somewhat complicated process through which ACOs can have two types of participants in their network of providers that they put onto their ACO Participant List which is sent to CMS for approval: (a)

providers who have their own TINs (which they call "Owned TINs"); and (b) "Managed TINs" a Managed TIN is essentially a participant in an ACO who itself has agreements with providers, who may or may not have their own TIN, to band together and participate under a given ACO exclusively under the Managed TIN. An ACO must have 5,000 "eligible lives" per TIN. Two ACOs in the marketplace cannot have the same TINs on their ACO Participation List that they submit to CMS. But, to be clear (a) an Owned TIN can only be on one ACO Participant List, but apparently, (b) a provider who is part of a Managed TIN can be on more than one ACO Participant List that is submitted to CMS.

Ms. Molsbee credibly testified that LTC ACO has had problems because of the departure of the five Individual Defendants.

**Witness #2, Krysten Krzyzewski ("KK")**. This was the key witness who provided hours of testimony. Interestingly, for most of her tenure at LTC ACO, KK was not an employee of the Debtors. She began as a consultant (i.e., independent contractor) for the Debtors beginning in 2015 and, over the course of her engagement, served in roles of increasing responsibility, ultimately holding the positions of Chief Strategy Officer, member of the Board of Managers, and then as Acting President for three months (between November 29, 2025, and February 28, 2026). The first documentation of her relationship with the Debtors submitted to the court was a Consulting Agreement, dated January 21, 2019, between a consulting company called Tremblant Consultants, LLC ("Tremblant"), which KK owns with her husband (who provides Medical Director consulting services unrelated to KK's LTC ACO services). This consulting agreement ("Tremblant Consulting Agreement") was originally with Genesis LLC. The Tremblant Consulting Agreement was amended on May 1, 2023, to switch out Genesis LLC as the contracting

party, changing it to LTC ACO, LLC.[3] The salient points of the Tremblant Consulting Agreement seem to be: (a) the Consultant (defined as Tremblant) was defined as an independent contractor and was "not exclusively limited to performing Services for Genesis and is entitled to provide Services for other parties other than Genesis"[4]; (b) Consultant's compensation was $250 per hour plus reimbursement of out-of-pocket expenses, payable monthly[5] ; (c) Consultant was required to "maintain complete and accurate records of all Services provided to Genesis, including those records required by any fiscal intermediary, governmental agency, or any other party to whom billings are rendered by Genesis for Services hereunder, in a form prescribed by or otherwise reasonably satisfactory to Genesis. Such records shall be and remain property of Genesis."[6]; (d) as to the books and records, pursuant to cited federal law, rules, and regulations, until the expiration of four years after the termination of the Agreement, "Consultant shall make available, upon appropriate written request of the Secretary [of the U.S. HHS and other state and federal regulators,] a copy of this Agreement and such books, documents and records as are necessary to certify the nature and extent of costs of services provided by Consultant under this Agreement"[7]; and (e) the Tremblant Consulting Agreement was for a one-year term, automatically renewable for successive one-year terms, unless sooner terminated, and the agreement could be terminated by either party, without cause, at any time, upon 30 days' written notice. On May 1, 2023, an amendment to the Tremblant Consulting Agreement was executed that (as earlier noted) changed the contracting party from Genesis LLC to LTC ACO. More significantly, the amendment changed Tremblant's compensation to a fee of $27,500 per month for the provision of services up to 100

[3] Pl.'s Ex. 7, DE # 27-7 (the Tremblant Consulting Agreement, along with the amendment).
[4] *Id.* at 3.
[5] *Id.* at 2.
[6] *Id.* at 1.
[7] *Id.* at 4.

hours per month and injected a profit-sharing success fee concept that Consultant might be eligible to earn, as set forth on an Attachment A. KK signed this May 1, 2023 amendment as "Head of Strategy & Program Development" for LTC ACO, LLC.

KK credibly testified, and it is undisputed that, throughout her approximately decade-long engagement with LTC ACO, she maintained all of her work files on her personal laptop, which belonged to Tremblant. Genesis did not provide her with a computer. This arrangement was known to and permitted by Genesis at all times.

KK was not involved with networking (bringing in new patients). Two other Individual Defendants—Bauer and Ward, who have gone with KK to True—were involved with networking, with Bauer being the Senior Director of Networking and Ward also being a Director of Networking. Romano, another Individual Defendant in this Action who has joined KK at True, was Vice President of Financial Strategy at LTC ACO. Ford, yet another Individual Defendant in this Action who has gone with KK to True, was Sr. Director of Credentialing (i.e., making sure ACO participants have Medicare credentials).

KK credibly testified that LTC ACO had been a successful business within the Debtors' enterprise. KK also credibly testified that, beginning in January 2025, LTC ACO experienced a series of leadership upheavals. For example, in January 2025, Genesis terminated an individual named Jason Feuerman, the co-founding Chief Executive Officer ("CEO") of LTC ACO (who co-founded the ACO business along with KK). Genesis then assigned an individual named Alexander Shaine, a non-ACO leader, to serve as the CEO of LTC ACO. Then an individual named Brittain Brantley was hired as LTC ACO's Chief Operating Officer, effective on or around August 1, 2025.

Alexander Shaine apparently then left LTC ACO at the end of November 2025 and that's when KK became acting CEO (with some controversy between her and Brittan Brantley).[8]

In January 2026, KK sent an internal email warning that competitors were actively recruiting key team members and that employee retention was at serious risk. This warning came in the wake of the departure of the Vice President of Data Analytics, who left for a direct competitor. KK testified that her warnings were ignored.

KK gave notice of her resignation on February 4, 2026. Her resignation letter documented the risk posed to LTC ACO from a lack of clarity on future profit-sharing payments and the damage from Mr. Brantley's leadership. There was clearly some kind of friction between KK and Brittain Brantley (the latter of whom did not testify to the court). KK testified that she stated these things in her letter, in an effort to protect the organization from obvious and foreseeable risks. She testified that on her last business day, February 27, 2026, she informed her professional contacts of her departure while assuring them that they remained in good hands with the LTC ACO team.

It was KK's further testimony that, on February 11, 2026, at the direction of the Genesis IT department, she uploaded all of her LTC ACO files from her personal Tremblant laptop and her personal OneDrive cloud account to a designated "Transitioned Executive" shared folder on the Genesis/ACO shared drive. She says she did this to ensure a smooth transition of her work product to LTC ACO. In connection with this process, the Genesis IT department demanded that KK destroy her files. KK credibly testified that she was concerned about Section 11 of the Tremblant Consulting Agreement, incorporating 42 U.S.C. § 1395x(v)(1)(I), that required KK to maintain consulting records for four (4) years following termination of the Agreement.[9] KK testified that

---

[8] Pl.'s Ex. 12 , DE #27-12; Pl.'s Ex. 18, DE #27-18.
[9] Pl.'s Ex. 7, DE # 27-7.

she flagged this compliance issue to Genesis's legal counsel. KK thought she could not simply destroy records that she was legally and contractually obligated to retain. Genesis legal counsel then drafted a limited waiver to address this issue. However, KK said that she was concerned that the limited waiver did not fully relieve her of her statutory record-retention obligations under federal law. Thus, KK did not destroy the LTC ACO records in her possession.

On February 28, 2026, KK's last day with LTC ACO, she emailed Genesis's legal counsel, Rochelle Moore, stating that she could not sign the limited waiver because it did not fully relieve her of statutory obligations to maintain records, and confirming that she would honor all confidentiality obligations under the Tremblant Consulting Agreement and maintain her files securely. Rochelle Moore confirmed receipt of her email on March 1, 2026.

KK further testified that, to ensure the security of the documents that KK believed she was obligated to retain, she subsequently "offloaded" the documents to a USB drive and placed the USB drive in a physical safe in her home, where it has remained. During her review of her personal computer to ensure compliance with a "Stipulation and Agreed Order to Maintain the Status Quo," entered soon after this Action was filed, KK identified four additional LTC ACO documents that had remained on her laptop computer. She testified that she was unaware these documents existed, and did not use them—rather, she immediately sent them to counsel and deleted them from her computer.

KK further credibly testified that a few weeks after she resigned from LTC ACO, the entity known as 101 W State Street Holdings ("101 W State Street"), the court-approved section 363 purchaser of the Debtors' assets, contacted her (in or around April 2026) to discuss potentially rejoining LTC ACO. She testified that she spent considerable time and effort negotiating a potential return to LTC ACO with 101 W State Street (making two cross-country trips to visit them).

Although there were face-to-face meetings, talks regarding compensation terms and other detailed discussions, KK believes that Genesis ultimately prevented LTC ACO from rehiring her and the other individual Defendants.

On March 4, 2026, KK formed the entity named LEAD LTC Holdings Group, LLC to explore the new so-called "LEAD ACO model" — a new program in which LTC ACO did not participate. On April 17, 2026, this entity's name was changed to True Holdings Group, LLC, and the other True entities were formed on or about March 18, 2026, March 25, 2026, and April 1, 2026 (collectively, "True"). Before proceeding with True, KK says she evaluated multiple offers to join competing ACOs. She says she ultimately decided to start her own organization because she believed she could better serve the long-term care provider community based on her decade of experience. Apparently, on or around April 20-24, 2026, the Individual Defendants Romano, Ward, Bauer, and Ford gave notice that they were leaving LTC ACO.

KK adamantly testified that True did not rely on any proprietary LTC ACO data or models. True instead relied on the decade-long experience of her and the other Individual Defendants, as well as CMS's publicly available regulatory information and data, and purchased databases. With regard to the latter, KK testified that True purchased, for $105,000 (relying on KK's own capital), data from Milliman, a well-known actuarial and consulting firm that provides consulting, data analytics, and software tools to help provider groups, ACOs, and health systems manage risk, analyze claims, and optimize value-based care performance (specifically, its "ACO Builder Forecast MSSP" and "ACO Builder Institutional Explorer MSSP," which "consolidate provider data into one comprehensive, up-to-date dataset representing all U.S.-based providers and group practices, including billing and servicing NPI, place of service, provider/clinician, group practice, clinic/location, and affiliation metrics; and that provides future projections into the performance

year to forecast shared savings or loss, allowing an ACO to determine alignment with CMS's projections"). This data apparently included some LTC ACO groups and many non-LTC ACO groups.

KK testified that "True's discussions with prospective participants consistently referenced publicly available CMS program details such as benchmark methodology changes, the LEAD program's 1.5% add-on for eligible participants, and risk adjustment model recalibrations, rather than any proprietary LTC ACO data."

KK credibly testified that she has seen competitors' forms of contract that they use with participants' (not merely LTC ACO's) during her career. There are lots of other competitors in this ACO space.

Notably, KK was not subject to any non-compete or non-solicitation covenants under the Tremblant Consulting Agreement. Apparently, the other Individual Defendants were, although only unsigned versions of these agreements were presented into evidence and these individuals were not called as witnesses.[10] . KK credibly testified that she did not know of these Individual Defendants' alleged agreements until she was told during this Action that they exist.

KK further testified that "a number" of provider groups reached out to her directly after she formed True. She says that these groups contacted her because of her reputation and expertise in the long-term care ACO space.

KK testified that True only has ***two providers*** on its ACO Participant List for year 2027 with a TIN overlap with LTC ACO. In other words, she disputes that there are 10 Overlapping Providers. The other eight participants identified by the Plaintiffs, that are allegedly Overlapping

[10] Pl.'s Ex. 5, DE # 27-5; Pl.'s Ex. 6, DE #27-6.

Providers, are in the nature of "Managed TINs" on LTC ACO's ACO Participant List and are in the nature of "Owned TINs" on True's ACO Participation List. To be clear, eight of the 10 allegedly stolen participants that the Action complains of are (a) show up on True's ACO Participant List for 2027 ***as individual participants with Owned TINs***; and (b) meanwhile show up on LTC ACO's ACO Participant List for 2027 ***under a Managed TIN entity whereby the "Managed TIN" is the TIN used***. Recall, that the subset of providers that participate under a Managed TIN do so without providing their own individual TINs—***such that a subset of providers can be a member of more than one Managed TIN and, thus, be on more than one ACO Provider List submitted to CMS***. But, an individual provider with its own TIN cannot be on more than one ACO Provider List. Recall, there is a requirement of 5,000 "eligible lives" per TIN.

KK credibly testified that extensive time and resources have been expended in creating True, including securing data subscriptions, negotiating with provider groups, filing with CMS, and building the operational infrastructure necessary to serve Medicare beneficiaries. She credibly testified that she has expended $500,000 of her own capital.

**Witness #3, Michael DaGrossa**. This witness is Vice President of Information Security and Chief Information Security Officer for Genesis. He seemed very knowledgeable about IT matters. He testified that he was asked to review the habits of the Individual Defendants pertaining to their computer usage/data activity close to the time they left LTC ACO. He was taking directions from the legal department and HR. They had first grown concerned when an employee at LTC ACO named Kevin Manning left and went to work for a competitor in or around January 2026. In or around April 2026, DaGrossa began conducting an analysis of the available account and information systems records associated with: KK, Romano, Ward, Bauer, and Ford. He presented to the court voluminous spreadsheets showing what he would characterize as a high volume of

downloads of LTC ACO materials by each of these Individual Defendants in the days/weeks before their departures from the company. In the case of KK, all activity was on February 11, 2026, or in one case, February 12, 2026. It is difficult to assess whether this was sinister or not, since KK credibly testified that it was on February 11, 2026, at the direction of the Genesis IT department, that she had "uploaded" all of her LTC ACO files from her personal Tremblant laptop and her personal OneDrive cloud account to a designated "Transitioned Executive" shared folder on the Genesis/ACO shared drive, and she also testified that she later downloaded onto a USB thumb drive the same documents and put them into a safe (out of concern with complying with federal law's four-year retention requirement). In other words, this testimony could likely explain the high volume of activity from KK that Mr. DaGrossa mentioned. As for the other Individual Defendants, while there is activity that might suggest something suspicious, there was frankly not enough context to draw conclusions (were these employees doing something they were instructed to do, along the lines of document retention, in connection with their departures? They were not called to testify, nor was anyone from Genesis other than the IT officer).

**Witness # 4, Louis Robicheaux.** This witness is co-CRO for the Debtors. He credibly testified about the high value of the LTC ACO business. He testified that a loss of all 10 Overlapping Participants that allegedly appear on both ACO Participant Lists for LTC ACO and True might mean a loss of $7-$9 million of EBITDA annually for the Debtors. The Sale Order this court signed January 26, 2026 provides, at paragraph 12, an injunction against interference with assets to be sold to 101 W. State Street. The Debtors view True's actions to violate this injunction.

## II. RULING

As noted earlier, the only question presented at this preliminary injunctive hearing is whether the Defendants have exercised control over section 541 property of the state and, thus, violated the Bankruptcy Code's automatic stay. The Debtors argue that the five Individual Defendants exercised control over property of the estate when they downloaded the Debtors' files and then utilized that information to start their new business and court the Debtors' ACO clients/participants. The argument continues that the Defendants interfered with contractual rights, usurped business opportunities, and misappropriated the Debtors' goodwill. This, the Debtors argue, was a willful violation of the stay. The Debtors argue that any contracts entered into with the 10 Overlapping Participants were violations of the automatic stay and are voidable and should be deemed to have no legal effect.

The Debtors cite to several cases wherein a competitor's solicitation of a debtor's clients results in a violation of the automatic stay due to the competitor's wrongful use of estate property such as customer information and goodwill.[11] However, facts always matter. Here, the key Defendant, KK, had been a consultant (not an actual employee) for most of her time with LTC ACO and, even when she became an executive and board member, had no noncompete or non-

---

[11] *In re Advanced Modular Power Sys., Inc.*, 413 B.R. 643, 667 (Bankr. S.D. Tex. 2009), aff'd sub nom. *Hsu v. West*, No. ADV 08-03177, 2009 WL 7760300 (S.D. Tex. Dec. 30, 2009) (debtor's officer found liable where officer started a competing business with the "same acronym, phone number, address, employees, customers, vendors, and suppliers" as the debtor, and also sent letters to customers offering to "service and provide technical support for products built by" debtor); *Cyganowski v. Biolitec U.S., Inc. (In re Biolitec, Inc.)*, 2015 Bankr. LEXIS 228, *35-37 (2015) (violation of the stay where debtor's officer started a competing business and used debtor's customer information to contact current customers, solicit sales, and falsely represent that the products formerly available from the debtor were now exclusively available through the competing business); *In re Alert Holdings, Inc.*, 148 B.R. 194, 198–99 (Bankr. S.D.N.Y. 1992) (violation of the stay where competing business solicited the debtor's customers list by falsely representing that the debtor was going out of business, was understaffed, was unable to properly monitor its accounts, had abandoned some accounts, that the competing business had "assumed" the debtor's accounts, and that the debtor's contracts with clients are probably unenforceable, as well as by trying to create the impression that the debtor's would possibly threaten the customers).

solicitation agreement. She never was issued a computer or laptop by the Debtors and, in the ordinary course, kept the LTC ACO data she used/created on her own (Tremblant) laptop. This is a somewhat inconvenient fact when it comes to the burden of proof. It is not clear at all whether KK formed her competing business (of which there are many ACOs in the marketplace) with anything other than years of knowledge, access to CMS public data, and purchased information from the vendor Milliman (which cost her $105,000). Additionally, KK and the other Individual Defendants did not move forward in any material way with True until negotiations with 101 W. State Street, for a potential return to LTC ACO, failed to bear fruit—with KK credibly testifying that she thinks that people at Genesis thwarted this effort with "draconian" terms that they injected. Also, remember that the contracts that LTC ACO has with its participants are for one-year terms (albeit with evergreen provisions). The court was not presented with a form of the contract, but it certainly sounds like participants can come and go at will.

Not only do facts matter, but the procedural context matters greatly here. At this preliminary injunction stage, this court believes that the four prongs for entitlement to a TRO or preliminary injunction apply—meaning that LTC ACO must establish that: (i) there is a likelihood of success on the merits that it could ultimately prove an automatic stay violation, after a trial on normal notice, with regard to the alleged exercise of control over property of the estate; (ii) it will suffer immediate and irreparable harm if this court does not enjoin the Defendants from retaining on True's ACO Partcipant list the 10 Overlapping Participants; (iii) the balance of harms weighs in favor of granting the Debtors this injunction; and (iv) the public interest weighs in favor of this injunction.

While a full trial on the merits may ultimately convince this court that data was misappropriated, that trade secrets were stolen, that contractual rights were interfered with, that

signed or acknowledged non-compete or non-solicitation or confidentiality agreements were violated, the court is not convinced, yet. Based on the evidence summarized above, the court cannot find a violation of the automatic stay. The court cannot get passed the 50-yard line to determine that there was an exercise of control over property of the estate. And the "balance of harms" at this juncture appears to be a toss-up.

Accordingly, the Plaintiffs' request for a declaration that the automatic stay has been violated and for preliminary injunctive relief, ordering that the 10 Overlapping Participants may not be included on True's ACO Participant List, is DENIED.

The Defendants are directed to submit an Order consistent with this Bench Ruling,

**#### END OF BENCH RULING ####**